**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00161 (RBW)** |
| **v.** | : | |
| | : | |
| **ROBERT LYON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Robert Lyon ("Lyon") to 90 days' incarceration, $2,000 in restitution, and one year of supervised release. A sentence of 90 days' incarceration falls at the midpoint of the Government's calculation of the applicable Sentencing Guidelines range.

## I.    Introduction

On the afternoon of January 6, 2021, Robert Lyon watched as his friend Dustin Thompson entered the U.S. Capitol Building through a door that had been violently breached by the crowd six minutes earlier.[1]  Thompson emerged three minutes later, having looted a congressional office and stolen a bottle of bourbon, and encouraged Lyon to come back inside to see the carnage.  Lyon knew, he later admitted, that it was illegal and wrong to enter the Capitol Building.  But he went anyway, following Thompson inside just five minutes later.  While there, Lyon saw rioters looting the offices of the Senate Parliamentarian and her staff.  Again, he knew that was illegal.  But Lyon

---

[1] This Court is intimately familiar with Lyon's conduct that day, having presided over the trial of Lyon's co-defendant Dustin Thompson in early April 2022.

did not leave until Thompson stole something else—a coat rack.  Indeed, Lyon and Thompson only left when police officers began to clear the crowds from the offices and adjacent hallway.

After they went outside, Lyon did not leave the Capitol Grounds.  Instead, he agreed to guard the coat rack for long periods of time, letting Thompson go back to the front lines, where the crowd was antagonizing and assaulting officers at various entry points.  Lyon referred to the coat rack in text messages to Thompson as their "trophy."

That evening, U.S. Capitol Police Special Agents stopped Lyon and Thompson on the street. They still had the coat rack in their possession.  A bottle of bourbon, partially drunk, was in Lyon's backpack.  (It was discarded, and thus cannot be definitively proven to be the bottle Thompson stole from the Senate Parliamentarian's office.  But the inference is obvious.)  Although he did not flee the agents like his co-defendant did, Lyon proceeded to, on three occasions, falsely deny to officers that he had ever entered the Capitol.  He did so once on January 6 and twice on January 11, 2021, when FBI agents followed up in an interview at his home.  He continued to lie about his conduct in that second interview even after an FBI agent saw his text messages to Thompson and instructed him to be honest with the FBI.

Lyon's conduct, of course, cannot be viewed in a vacuum. It took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, halt the certification of the 2020 Electoral College vote count, and force the Vice President of the United States and Members of Congress to seek safety.  The rioters injured more than one hundred law enforcement officers and caused more than 2.7 million dollars in losses.[2]  But for his actions

---

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 21-CR-54-TSC, Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, Lyon's entrance into the office of one of the key employees charged with assisting the Certification efforts, his participation in the theft of government property, and his subsequent false statements to law enforcement render a custodial sentence both necessary and appropriate.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

The government refers the Court to the general summary of the attack on the U.S. Capitol. *See* ECF 36 (Statement of Offense) at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

### *Robert Lyon's Role in the January 6, 2021 Attack on the Capitol*

On January 3, 2021, Lyon texted his co-defendant, Dustin Thompson, about the upcoming "Stop the Steal" rally that former President Trump had planned for January 6, 2021: "So the big rally is this Wednesday." On January 5, 2021, Thompson texted: "Leaving for dc in the morning this is your notice soldier." *See* Dkt. 110 ("PSR") at ¶ 25. But at this point, Lyon was less enthusiastic: "Im not sure I'm goin pretty tired and broke." After further persuading by Thompson, Lyon agreed to go. He was, at that time, still on pretrial diversion probation imposed by a state court for having trespassed with Thompson at a public park in Ohio in June 2020. *See* PSR ¶ 68.[3]

---

[3] The government's understanding is that that trespass charge was later dismissed per the terms of Lyon's pretrial diversion agreement.

The pair drove from the Columbus, Ohio area to Washington D.C. on the evening of January 5, 2021.  After arriving in D.C., they traveled to the former President's rally around 11 a.m.  After Trump finished speaking, Lyon and Thompson walked around the White House and down Pennsylvania Avenue to the Capitol Building, where they crossed the North Lawn and made their way to the courtyard outside the Senate Parliamentarian's office.   Lyon's co-defendant Thompson was, by this point, wearing a bulletproof vest.   Lyon was carrying a "Stop the Steal"/"Trump Won" sign, as depicted in the following photograph (Lyon is wearing the orange hat):



*See* Ex. 231A at 0:08.[4]  While Lyon waited outside, Thompson made his first entry into the building at 2:48 p.m.  Prior to Thompson's entry, Lyon told Thompson several times—before and after Thompson went into the building—not to go inside, but could not dissuade Thompson.  Dkt. 64 at ¶ 10.  Lyon told Thompson that Lyon thought it was unlawful to enter the building.  *Id.*

Thompson entered the Senate Parliamentarian's office.  Inside, rioters were looting the office and celebrating.  Thompson left the office at 2:51 p.m., openly carrying a stolen bottle of bourbon, undeterred by the U.S. Capitol Police officers directly outside the office as shown in the following photograph:



Ex. 226.  "After Thompson left the U.S. Capitol Building, he found Lyon and asked Lyon to follow him inside."  Dkt. 64 at ¶ 11.  Even though he believed it was unlawful to enter, Lyon nonetheless chose to accompany his friend inside the Capitol.  Thompson, this time with Lyon, entered the

---

[4] To avoid confusion, the government has named its video and photograph exhibits to this sentencing memorandum, each of which was introduced in the trial of Lyon's co-defendant, Dustin Thompson, consistent with the exhibit number assigned to the video or photograph during the trial.

Senate Parliamentarian's office, where Lyon witnessed other rioters looting the office.  Dkt. 64 ¶ 11.  Thompson stole a coat rack from the office.

At some point, Thompson recorded himself celebrating inside the office.  He also, at some point on one of these two trips, stole a U.S. Capitol Police pager used to convey alerts and emergency messages throughout the Capitol Building.

Thompson (circled in red below) and Lyon (circled in green) exited the building at 3:01 p.m., with Thompson carrying the stolen coat rack:



Ex. 223.

The Senate Parliamentarian and her Assistant Parliamentarians played a key role in the Congressional certification, including opening the Senate on January 6, 2021, Dkt. 73 at 1, commencing the certification itself, *id.*, and assisting the presiding officer, Vice President Michael Pence, during the certification, *id.* at 1-2.  The Parliamentarians expected to return to their offices to work throughout the day: they "expected to have access to their office throughout the day and such access would have assisted them in performing their duties during the Certification."  *Id.* at

2.  But as this Court is aware from the trial in Mr. Thompson's case, their offices were thoroughly trashed by the rioters, including Thompson and Lyon, who invaded it on January 6, 2021. "[S]everal pieces of office equipment . . . , including computers, printers, and several phones, were broken. Some phones were stolen. Papers and official documents had been scattered on the floor. One set of doors . . . could not be properly locked or even closed, which made the office an unsecure location for sensitive documents."  Dkt. 73 at 2.  Without their office computers, "the Parliamentarians had only one laptop to complete their work" after the rioters were cleared on January 6.  *Id.*  This is just a glimpse of what the office looked like afterward:





Exs. 274, 286.[5]  Meanwhile, Lyon and Thompson then made their way to the north end of the Capitol Building.  Around 3:30 p.m., Thompson left Lyon with the coat rack to go to the North Doors of the Capitol Building.

At 4:03 p.m., Lyon, standing with the coat rack, texted Thompson when the two were still apart from one another: "We need to get the fuck out with this trophy." Thompson replied: "Follow the tear gas n ill find me." Lyon said: "Im fighting people off". Thompson said: "Leave by the tree let's g0". Lyon replied: "Im bout to get shot or arrested for this bs. People WANT IT." Thompson replied: "Going inside" and "Sell it $500". Lyon replied: "Some girl died already," to which Thompson replied: "Was it Pelosi"? During this time, Thompson was still at the North Doors of the U.S. Capitol, encouraging the crowd of rioters attempting to breach those doors.

---

[5] Exhibit 286 was not offered into evidence at Thompson's trial.  It is an open-source photograph.

Thompson eventually left and reunited with Lyon.  Still, Lyon did not leave the area. Instead, around 4:30 p.m., Lyon accompanied Thompson to the west side of the Capitol Building, where he and Thompson watched the crowds fighting with and struggling against police officers. For much of the time between 4:30 p.m. and 5 p.m., Thompson was near the lower west tunnel, where law enforcement officers were repeatedly and viciously assaulted.  Lyon waited for Thompson approximately fifty to one hundred yards to the west of that location, on the west plaza.

At approximately 6 p.m. that night, two U.S. Capitol Police Special Agents approached Thompson and Lyon while they were sitting on the sidewalk at the corner of South Capitol Street and C Street, SW.  Thompson and Lyon told the Special Agents they were waiting for an Uber. When Thompson and Lyon began to leave, Thompson picked up the coat rack, which he still possessed.  At that point, the Special Agents recognized the coat rack as one that appeared to have been taken from the Capitol Building and instructed Thompson to drop the coat rack.  Thompson did so but then fled on foot.  The agents interviewed Lyon but were unable to find Thompson. During his interview, Lyon provided Thompson's name and phone number but denied personally entering the Capitol Building.  In Lyon's bag, special agents found an open bottle of bourbon.

At 8:04 p.m., Thompson texted his wife, S.T., and Lyon the video Thompson had filmed of himself inside the Senate Parliamentarian's office earlier that day.  S.T. replied: "I will not post bail".  At 8:26 p.m., Lyon sent a text message to Thompson that stated: "Maybe dont send incriminating shit to my phone might get warranted or something lol."  Thompson replied by texting Lyon a photograph of Thompson posing with the coat rack and pager just outside of the Capitol Building.

Over the next few days, Lyon texted with a different friend, minimizing his January 6 conduct, expressing anxiety, and largely blaming Thompson:

- "Sad part is i was trying to leave and no do dumb stuff the whole time lol".

- "Who knows whats about to happen.  D seems not worried while I'm a wreck"

- "Luckily i wasnt with dustin for almost all of that" and "I kept telling him not to go in"

- "Im sick just thinking about the mistakes"

- "Stomach in so many knots"

- On January 8, he texted a friend, "dont feel good" and later clarified, "diarrhea lol probably stress related been expecting fbi to call any minute lol"

- "D is gonna end up in prison lol"

- "if i go to prison for bs just know i loved ya my guy lol"

- "I got anxiety like a mofo"

During a second interview with FBI agents on January 11, 2021, Lyon again falsely stated that he "never entered the capitol building," and that the "closest he got was the stairs where he waited on Thompson."  Lyon further falsely stated that Lyon first saw Thompson carrying the coat rack outside and did not ask where it came from—when in fact Lyon was inches away from Thompson as Thompson carried it out of the building.  When confronted with his text messages to Thompson about the "trophy" coat rack, Lyon a third time denied to agents that he had entered the Capitol Building.

*The Charges and Plea Agreement*

On January 22, 2021, Robert Lyon was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2); 40 U.S.C. §§ 5104(e)(2)(D) and (G); and 18 U.S.C. § 641. On January 25, 2021, he was arrested at his home in Ohio. He was subsequently indicted, and on February 9, 2022, Lyon was charged by superseding indictment with violations of 18 U.S.C. § 1512(c)(2) and § 2;

18 U.S.C. §§ 1752(a)(1) and (2); 40 U.S.C. §§ 5104(e)(2)(D) and (G); and 18 U.S.C. § 641.  On March 14, 2022, he pled guilty to Counts Two and Four of the superseding indictment, charging him with a violation of 18 U.S.C. § 641, Theft of Government Property, and 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in the Capitol Building. By plea agreement, Lyon agreed to pay $2,000 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties and Sentencing Guidelines

#### A.  The Statutory Penalties

As noted by the plea agreement and the U.S. Probation Office, Lyon faces up to one year's imprisonment, a term of supervised release of up to one year, and a fine of up to $100,000. Lyon must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

#### B.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. Those Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions."  *Id.* at 49. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101; *see also Rita v. United States*, 551 U.S. 338, 349 (2007). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "*significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).

Where they apply, the Guidelines unquestionably provide the most helpful benchmark for the Court in ensuring consistency and fairness across the hundreds of Capitol riot cases.

With one exception, the government agrees with the Sentencing Guidelines calculation set forth in the PSR. The U.S. Probation Office calculates Lyon's adjusted offense level under the Sentencing Guidelines as follows:

**Count Two (Theft of Government Property):**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| Adjusted Offense Level | 6[6] |

**Count Four (Disorderly/Disruptive Conduct):**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Adjusted Offense Level | 6 |

**Grouping:**

According to the PSR, Counts 2 and 4 group in this case because the victims are the same.

| | |
|---|---|
| Acceptance of Responsibility (USSG § 3E1.1(a)) | -2 |
| Total Adjusted Offense Level: | 4 |

*See* PSR at ¶¶ 41-53.

---

[6] Although stipulated as applicable by Lyon and the government in the plea agreement, the government no longer believes the +3 offense-level adjustment for an official victim applies to Count Two. Section 3A1.2(a) applies that adjustment only "when specified individuals are victims of the offense," not "when the only victim is an organization, agency, or the government." U.S.S.G. § 3A1.2 n.1. The coat rack that was stolen from the Senate Parliamentarian's office is owned by the Office of the U.S. Senate Sergeant at Arms, a public entity, and not the Senate Parliamentarian herself. See https://www.senate.gov/reference/office/sergeant_at_arms.htm ("The Office of the Sergeant at Arms (SAA) is the largest in size of staff and budget in the Senate. It is responsible for all Senate computers and technology support services, recording and photographic services, printing and graphics services, and telecommunications services."). The Office of the U.S. Senate Sergeant at Arms' Capitol Facilities office was responsible for purchasing the coat rack and would have been responsible for paying to replace it had it been lost. While it was assigned specifically to the Senate Parliamentarian's office, the Office of the U.S. Senate Sergeant at Arms is most appropriately viewed as the victim of the theft.

The U.S. Probation Office calculated Lyon's criminal history as a category I, which the government does not dispute. PSR at ¶ 66. Accordingly, the U.S. Probation Office calculated Lyon's total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 53, 99.

Although the government also calculates Lyon's ultimate guidelines range to be 0-6 months, the government's calculation differs with respect to the appropriate base offense level for the conviction under 18 U.S.C. § 1752(a)(2). Section 2A2.4 of the Sentencing Guidelines, not Section 2B2.3, is the most appropriate guideline that applies to such a conviction. The Sentencing Guidelines provide that a defendant convicted of an 18 U.S.C. § 1752 offense is subject to either Section 2A2.4, which is titled "Obstructing or Impeding Officers," or Section 2B2.3, which is entitled "Trespass." *See* U.S.S.G., App. A. If more than one Guidelines provision may apply to a particular offense, the court should "use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 cmt. n.1. The "most appropriate" of the two potentially applicable guideline provisions is the one that best reflects the "offense conduct charged" in the count of conviction, based on a consideration of the elements of the offense. U.S.S.G. § 1B1.2 cmt. n.1; *accord id.* § 1B1.2(a).

Under this standard, the most appropriate guideline for a Section 1752(a)(2) offense is that found in Section 2A2.4. Section 1752(a)(2) criminalizes "engag[ing] in disorderly or disruptive conduct" that "in fact, impedes or disrupts the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2). As noted above, Section 2A2.4 is entitled "Obstructing or Impeding Officers," a title that parallels Section 1752(a)(2)'s requirement that the defendant have "*in fact*" "impede[d] or disrupt[ed] . . . Government business or official functions" undertaken by government officials.

13

The contrast with Section 1752(a)(2)'s neighboring provision, Section 1752(a)(1), makes even clearer that Section 2A2.4, not 2B2.3, is the appropriate guidelines provision.  Section 1752(a)(1) criminalizes merely "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority"—functionally, illegal trespass on Capitol grounds.  The most appropriate guidelines provision for that offense is thus plainly Section 2B2.3, which covers "Trespass."[7]  But an offense like Section 1752(a)(2), which requires that the defendant both have engaged in disorderly or disruptive conduct *and* in fact have impeded government officials conducting official business, is not captured by a mere "Trespass" guideline.  It does, however, correspond closely to an "Obstructing or Impeding Officers" guideline.

Moreover, even if one assumed that Section 2A2.4's "Obstruction" guidelines do not *perfectly* reflect the offense conduct of a Section 1752(a)(2) offense, that does not mean Section 2B2.3 applies.  There is no default rule favoring the more lenient guidelines provision. Instead, the only question under the guidelines is which of the two guidelines provisions better captures—even if only slightly better—the offense conduct. And here, a guidelines provision for "Obstructing or Impeding Officers" clearly is *closer* to reflecting the offense conduct (disorderly and disruptive conduct that impeded government officials) than a guidelines provision for "Trespass," which does not reflect disorderly or disruptive conduct, or interference with government officials, at all.

Finally, although the "most appropriate" guideline should be determined only by the "offense conduct charged"—that is, the elements of the Section 1752(a)(2) offense—the facts of this particular case also favor application of Section 2A2.4.  In this case, there are identifiable officers whose official functions were impeded by Lyon's conduct: the Senate Parliamentarian and

---

[7]  And indeed, the PSRs in cases involving Section 1752(a)(1) offenses appear to have overwhelmingly (or exclusively) applied U.S.S.G. § 2B2.3 to that offense.  *See United States v. Sidorski*, 21-CR-48-ABJ, Dkt. 45 at 3-4.

Assistant Parliamentarians, who could not use the office while he was inside, nor after he left.  As noted above, the Parliamentarians expected to return to their offices to work, but the rioters had broken several pieces of office equipment, trashed the office, broken the doors such that they could not lock, and generally compromised the office as a workspace, leaving the Parliamentarians without the resources they needed for the Certification.  *See supra* 6-8.

It appears that in at least six other PSRs in separate cases, the Probation Office has agreed with the United States that Section 2A2.4 and its base offense level of 10 is the appropriate guideline for Section 1752(a)(2) offenses.  *See United States v. Rubenacker*, No. 21-CR-193-BAH, Dkt. 52 at ¶ 46; *United States v. Simon*, No. 21-CR-346-BAH, Dkt. 59 at 20 (Sentencing memorandum setting forth PSR calculation); *United States v. Bromley*, No. 21-CR-250-PLF, Dkt. 48 at ¶ 45; *United States v. Sidorski*, 21-CR-48-ABJ, Dkt. 42 at 19-20 (Sentencing memorandum setting forth PSR calculations); *United States v. LaRocca*, *et al.*, 21-CR-317-TSC, Tr. 8/10/22 at 19; *United States v. Baggot*, No. 21-CR-411-APM, Dkt. 67 at 17-18 (Sentencing memorandum setting forth PSR calculations).  It likewise appears that to date judges have applied 2A2.4 in those cases:  Chief Judge Howell in *Simon*, Judge Friedman in *Bromley*, Judge Chutkan in *LaRocca*; and Judge Berman Jackson in *Sidorski* (though Judge Berman Jackson applied it because the parties agreed to it and the case involved obstruction of a law enforcement officer; Judge Berman Jackson otherwise declined to agree with the government's argument in favor of 2A2.4).  Because the appropriate guidelines provision is determined based on the elements of the Section 1752(a)(2) offense, not a rioter's particular conduct, the U.S. Probation Office's application of Section 2A2.4 in these cases would logically indicate it applies here as well.

The government's proposed guidelines calculation is therefore:

**Count Two (Theft of Government Property):**

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(2)) | 6 |
| Adjusted Offense Level | 6 |

**Count Four (Disorderly/Disruptive Conduct):**

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4(a)) | 10 |
| Adjusted Offense Level | 10 |

**Grouping:**

| | |
|---|---|
| Higher offense level of grouped counts (U.S.S.G. § 3D1.3) | 10 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Total Adjusted Offense Level: | 8 |

Coupled with a Criminal History Category of I, the advisory Guidelines range remains zero to six months. See U.S.S.G., Ch. 5, Pt. A (Sentencing Table). The government's recommendation of 90 days' incarceration is the middle of that Guidelines range.

## IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

Section 3553(a) of Title 18 identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### C.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms. By its very nature, the attack defies comparison to other events.

Nonetheless, the government assesses each rioter's conduct on a spectrum, and suggests the Court look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol Building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence or obstructed justice; (6) the length of the defendant's time inside of the building, and where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Lyon personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Lyon's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Lyon from most other misdemeanor defendants.

The factors cited above, weighed in combination, favor a 90-day custodial sentence. Below, the government analyzes Lyon's conduct under the rubric set forth above.  But top of mind should be two key facts that distinguish Lyon from many other misdemeanant defendants: (1) he entered the Senate Parliamentarian's office, an area that was obviously off-limits to the public even when the building was open to the public, and (2) he aided and abetted Thompson's theft of the

coat rack, including by taking custody of this "trophy" for long stretches to free up Thompson to return to where crowds were harassing or assaulting police officers.

*First*, Lyon entered the Capitol Building through a set of doors that were opened by members of the crowd who had smashed the glass, opened the emergency lock bar, and then violently fought past officers to gain a foothold in the hallway. Lyon was likely aware of the circumstances of entry; open-source video shows him watching from outside as the crowd struggles through the door. *See* Ex. 231A at 0:03-0:09. Moreover, Lyon was invited inside by Thompson, his co-defendant. Lyon has admitted that he believed it was unlawful to enter and warned Thompson against doing so. The fact that he nonetheless chose to enter the building, despite some awareness of what was occurring inside, shows his disregard for the law and the safety of those inside. Upon entering the hallway, he would have heard a loud, blaring alarm, as video and witness testimony established during Thompson's trial. *See* Ex. 248 at 0:49-0:59. He would have seen a scene of chaos and a mob chanting at outnumbered U.S. Capitol Police officers. And he likely would have seen broken glass on the ground. The fact that he nonetheless continued and entered the Senate Parliamentarian's office with Thompson, again, displays a lack of concern about the criminal activity occurring around him.

*Second*, by choosing to join a mob that was trashing the Senate Parliamentarian's office, Lyon effectively encouraged that conduct. Lyon did not leave upon seeing the destruction that the mob had wrought inside the Office. He could have easily done so, leaving Thompson inside. But instead, he waited until Thompson had stolen a coat rack and was ready to leave.

Lyon then assisted in the theft of that coat rack. Lyon's participation in the theft of government property renders him distinct from most other misdemeanant rioters. Those

misdemeanants who have engaged in similar conduct have received sentences including terms of incarceration comparable to those recommended here.  *See infra* 23.

*Third*, Lyon's length of time inside the building—five minutes—is on the lower end relative to other rioters.  That said, both Thompson and Lyon only left once officers were clearing the hallway, and within minutes of them leaving the Senate Parliamentarian's office, officers completely cleared it of rioters.  It is thus impossible to know how long Lyon would have stayed inside the building had their rioting been uninterrupted.

Moreover, after Lyon left, he and Thompson remained on Capitol grounds for over two additional hours.  During that time, as this Court saw during Thompson's trial, Thompson joined mobs attempting to breach the building at two other entrances—the North Doors and the lower west tunnel.

*Fourth*, Lyon lied in each of his two interviews with FBI agents about the key inculpatory fact with respect to him: whether he had entered the Capitol Building.  In the second interview, he lied again even after being told he needed to be honest with investigators.  What mitigates Lyon's obstructive conduct is that he was otherwise cooperative with the agents, agreeing to be interviewed, providing them the name and phone number of his co-defendant, Thompson, and allowing them to search his backpack and copy the data from his cell phone and camera.

Lyon's offense requires a custodial sentence.

### D.  The History and Characteristics of the Defendant

Lyon is 28-years old and works as a pest control technician.  As set forth in the PSR, he received a high school education and an upbringing free of abuse or trauma and has no criminal history. PSR ¶¶ 64-66, 74.  Lyon has been compliant with his conditions of pre-trial release.

### E.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol Building and grounds was an attack on the rule of law and a "national disgrace." *United States v. Stotts*, 21-CR-272-TJK, Tr. 11/9/21 at 31. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8]

This was not a peaceful protest, or a driving offense in a National Park, or a victimless, minor drug offense. What occurred on January 6 is clearly incomparable to run-of-the-mill misdemeanors.  The sentence imposed must reflect the gravity of that attack.  This factor thus supports a sentence of incarceration, as it will in most cases, including petty misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### F.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

In this case, both general deterrence and specific deterrence require a custodial sanction. 18 U.S.C. § 3553(a)(2)(B)-(C). Indeed, general deterrence may be the most compelling reason to

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

impose a sentence of incarceration. The violence at the Capitol on January 6 was intended to, and did, interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing in *United States v. Hodgkins*, 21-cr-188:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70; *see also United States v. Gallagher*, 21-cr-41, Tr. 10/13/2021 at 37 (Judge Nichols: "Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred."); *Mazzocco*, 21-cr-54, Tr. 10/4/2021 at 24 (Judge Chutkan: "What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.").  It is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences, as this Court has noted. *United States v. Mariposa Castro,* 21-CR-299-RBW, Tr. 2/23/2022 at 41-42 ("[I]f people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.").  This is the most important factor that this Court must consider.

A custodial sentence is also necessary to deter Lyon specifically.  Lyon was still actively on probation as part of a pre-trial diversionary program for a far less serious offense—trespassing

in a public park in Ohio when the park was closed—when he chose to go to the Capitol Building and engage in this conduct.  The probationary period and fine he received for that offense did nothing to deter Lyon from engaging in misconduct even while *on* probation.  And the attack on January 6, 2021 is obviously orders of magnitude more harmful than a trespass at a closed public park.  Moreover, while Lyon at times put up some mild resistance to Thompson's plan to travel to D.C. or enter the Capitol Building, each time he capitulated quickly and joined Thompson.  Even after January 6, he told interviewing FBI agents that he believed what had occurred was a "misunderstanding," and lied about his role that day.

The government does note, however, that unlike Thompson, Lyon regretted his conduct, as shown by his post-January 6 text messages to a friend.  But Lyon was one of the few rioters who was arrested on January 6.  That he expressed anxiety after he was caught thus counts less in his favor than if he had expressed regret or remorse before realizing he might be arrested.

### G.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[9]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.

"The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A sentence within a Guideline range 'necessarily' complies with

---

[9]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

§ 3553(a)(6).").  Assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. Here, the appropriate pool is comprised of other Capitol breach offenders because the Capitol breach was *sui generis*.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed on other misdemeanants convicted of theft of government property for reference.  Defendant Jason Riddle was sentenced to 90 days' incarceration by Judge Friedrich for his misdemeanor Section 641 conviction—which also involved theft from the Senate Parliamentarian's office—as well as 36 months' probation and 60 hours of community service for his misdemeanor offense under 40 U.S.C. § 5104(e)(2)(G) (Class B misdemeanors are not subject to the sentencing guidelines, unlike the Class A misdemeanor of which Lyon was convicted under 18 U.S.C. § 1752(a)(2)).  *See* 21-CR-304-DLF, Dkt. 36.  Defendant William Merry received a sentence of 45 days' incarceration from Judge Boasberg for a misdemeanor Section 641 conviction.  *See* 21-CR-00748-JEB, Dkt. 49.  Aaron Mostofsky, who also interfered with law enforcement and was convicted of the felony offense of participating in a "civil disorder," in violation of 18 U.S.C. § 231(a)(3), as well as of a Section 641 offense, received a sentence of 8 months' incarceration from Judge Boasberg.  *See* 21-CR-138-JEB, Dkt. 110.  The government's recommended sentence of 90 days' incarceration for Lyon fits comfortably into these sentences.

Lyon is also situated very differently from his co-defendant, Dustin Thompson, as Thompson's significantly higher guidelines range reflects. Most notably, Lyon was not convicted of a felony offense, while Thompson was convicted of obstructing Congress's certification of the vote in violation of 18 U.S.C. § 1512(c)(2). Their conduct on January 6 also differed dramatically. Thompson, Lyon's significantly older friend, instigated the pair's travel to D.C. on January 6; Thompson, not Lyon, wore a bulletproof vest. Based on both Lyon's roughly contemporaneous text message to his friend and Lyon's later interview with the government, it appears that Lyon initially told Thompson not to enter the Capitol Building. Nonetheless, Thompson entered the building first, then came back and apparently convinced Lyon to re-enter with Thompson. Unlike Thompson, Lyon did not steal anything himself from the Senate Parliamentarian's office; he assisted Thompson's theft by later taking custody of the stolen coat rack. Unlike Thompson, Lyon did not later seek to re-enter the Capitol Building or join crowds confronting or engaging with police officers. When confronted by the two U.S. Capitol Police special agents, Thompson fled, while Lyon stayed put. Lyon then gave the special agents Thompson's name and phone number, permitting them to identify Thompson, and later provided key text messages from Thompson to the FBI that were used to convict Thompson at trial. Finally, unlike Thompson, Lyon took responsibility for his conduct, pled guilty, and did not testify falsely under oath. These many differences were taken into consideration by the government in formulating its recommendation in this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).

## V.    Conclusion

Balancing the § 3553(a) factors, the government recommends that this Court sentence Lyon to 90 days' incarceration, $2,000 in restitution, and one year of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052


*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov