UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim. No. 21-161 (RBW) |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| ROBERT LYON | ) |  |
|  | ) |  |
|  | ) |  |

## MEMORANDUM IN AID OF SENTENCING

Robert Lyon was not sure about going to the Capitol on January 6th, but his friend, Dustin Thompson, persuaded him to go. They attended the rally. They got food at the food trucks. Then, Thompson wanted to go inside. Lyon told him it was not a good idea. Thompson insisted. Mr. Lyon was unable to dissuade Thompson. They spent 5 minutes inside, from 2:56 p.m. to 3:01 p.m. The whole time Lyon was inside he knew they should not have been there. He texted Thompson that they were going to get arrested for this "BS." While Mr. Lyon worried, Thompson sought to get his hands on what he could – two bottles of liquor and a coat rack. Before they left the building, Thompson handed Mr. Lyon the coat rack. The two were separated in the crowd of people leaving the Capitol and then found each other again. The entire time, Mr. Lyon deeply regretted his actions.

For the last 20 months, that regret has not changed. Every day for 20 months, he has thought about the shame that his actions have brought upon him and his family. Lyon regrets going to the Capitol that day, not simply because he was arrested, but because he did not use the better judgement he had, the better

1

judgement that his parents had instilled in him. His first thought was the correct one – do not go inside. But when encouraged by his friend, he went inside. His first thought when the FBI came to his house was not to run, even though his friend fled. But, fear overtook his logic and he denied being in the building. He was anxious and nervous. The stress he endured about January 6th, that he tried to make light of in text messages to friends, pounded like a ton of bricks in his chest. He could not admit to the FBI that he was so senseless.

There was no intent to deceive anyone. There was no intent to hide evidence. He gave the FBI his phone to search, as well as his backpack and permitted them to copy his cellphone data. He was not part of a militia group seeking to overthrow the government. He did not encourage violence.

Hundreds of people have been sentenced for their actions on January 6th. Some have felt justified in their actions that day. Lyon is not one of those people. Some prepared for battled in order to "Stop the Steal." Lyon is not one of those people. And, some posted photographs of themselves boasting of their conduct that day. Lyon is not one of those people. For these reasons, no incarceration should be imposed. Based on the nature and circumstances of the offense, his background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of probation and home detention, which would be a sentence not greater than necessary to address his conduct in this case.

# TIMELINE OF JANUARY 6th EVENTS

The timeline of January 6th is well-known. Approximately 30,000 people were expected to attend.[1] Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[2] Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

**11 a.m.**    High-profile figures of the Republican Party spoke directing the Trump supporters:
- Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[3]
- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[4]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and **"punch back from Donald Trump."**[5]

---

[1]    Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants. *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[2]    George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[3]    *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

[4]    *Id*. (emphasis added).

[5]    *Id*. (emphasis added).

- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right."**[6]
- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[7]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[8]

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| | |
|---|---|
| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[9] |
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[10] |

---

[6]   *Id*. (emphasis added).

[7]   *Id*. (emphasis added).

[8]   *Id*. (emphasis added).

[9]   *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]  *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-

It is no surprise that after hearing these speeches, hundreds of people started marching toward the Capitol.  By this time, some Trump supporters started fighting with the police..

**1:10 p.m.**                    Supporters "begin grappling with police on the Capitol steps." [11]



**1:30 p.m.**                    After Trump's speech, "supporters being marching toward the U.S. Capitol."[12]

**2:11 p.m.**                    Photographs indicate that supporters moved past the police lines on the west side of the Capitol and others scale the walls.[13]

---

speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[11]     Petras, *Timeline*, footnote 2 supra.
[12]     Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/ (last accessed on Feb. 28, 2022).
[13]     Petras, *Timeline*, footnote 2 supra.

- **Robert Lyon did not breach the perimeter or fight officers to get past the perimeter lines.**



| | |
|---|---|
| **2:48 p.m.** | Thompson entered the Capitol building and Lyon remained outside. |
| **2:56 p.m. to 3:01 p.m.** | Lyon and Thompson entered the Capitol and left. |

Lyon and Thompson remained on the Capitol grounds until 6 p.m. At that time, two U.S. Capitol Police Special Agents approached them and after some questioning, Thompson fled when they asked him to drop the coat rack. Lyon remained and answered their questions.

## LEGAL PRINCIPLES

Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) and Aiding and Abetting Theft of Government Property, in violation of 18 U.S.C.§641, §2, are class A misdemeanors, as defined by 18 U.S.C. § 3559(a)(6), because they carry a maximum incarceration period of one year. The United States

Sentencing Guidelines apply to class A misdemeanors and suggest that a sentence between zero and six months would be appropriate, based on zero criminal history points and a total offense level of 4. The law states Mr. Lyon is eligible for probation because these offenses are misdemeanors. 18 U.S.C. § 3561(c)(2).

## Sentencing Law

For 200 years, federal judges had wide discretion when it came to sentencing and could sentence how they saw fit and "there was virtually no appellate review of the trial judge's exercise of sentencing discretion."[14] Former federal judge, Marvin E. Frankel was the "most influential critic[] of indeterminate federal sentencing" and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'"[15] Judge Frankel called for a "Commission on Sentencing" and the enactment of laws to make guidelines that would be "binding" on federal judges.[16] Congress answered Judge Frankel's call and in 1984 the Sentencing Commission was born. For decades, the U.S. Sentencing Guidelines were binding.

The era of binding guidelines ended seventeen years ago, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the

---

[14] Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993).
[15] *Id.* at 228.
[16] *Id.*

7

Guidelines effectively ***advisory***." *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

> 18 U.S.C. § 3553(a) provides that the Court must consider:
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    (B) to afford adequate deterrence to criminal conduct;
>    (C) to protect the public from further crimes of the defendant; and
>    (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
>    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such

8

> amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …
>
> (5) any pertinent policy statement— …
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of

9

the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

## ARGUMENT

While the nature and circumstances of the January 6th events were indeed serious, Mr. Lyon's particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration. Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive.

### I. Nature and Circumstances of Mr. Lyon's Offense

The events of January 6th are seared into the nation's memory. That day and the days after resulted in lost lives and over 1 million dollars in property damage. In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Lyon understands and would never minimize the impact of the event on the nation. However, his actions have to be judged individually. He was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings. He entered the building unlawfully and knew he should not have. However, his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split

between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[17] To characterize Mr. Lyon as the proximate cause of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual. The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

      Mr. Lyon did not wear tactical gear or bring weapons to the Capitol. He did not attend the rally or march to the Capitol, looking for a fight. Instead, he lent his voice to a cause based on a later-proven falsehood that the election was stolen. For that, he should not be punished. His unlawful entry into the Capitol building lasted five minutes. He entered after being urged to enter by Thompson. He held the coat rack after it was handed to him by Thompson. His bag contained a bottle of bourbon that it appears Thompson took from the Capitol. Mr. Lyon does not justify his conduct and took responsibility for his actions.

---

[17]    *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

## II. Mr. Lyon's History and Characteristics

Mr. Lyon has a close-knit family and had a stable family life. He is the youngest of three boys. He was very close with his mother so when she passed away suddenly in 2018, it was particularly difficult for him.

Two years later in 2020, he was involved in a serious car accident, leaving him with chronic back pain. He did not go to the hospital. His general practitioner referred him to physical therapy and a chiropractor. He did not follow up because of lack of health insurance. Lack of insurance was also the reason why he was unable to finish the dental work he needed for the past year. Recently, he was able to get the dental work he needed, paying much of it out of his pocket.

While he is employed, Mr. Lyon has lived with family and friends who have provided him with financial support. His friends describe him as:

- "a very hard worker"
- "a wonderful friend" and
- "kind and responsible."[18]

## III. A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Incarceration is

---

[18] Letter of support from M.E. and C.E. (Exhibit 1).

not required in order for a sentence to reflect the seriousness of the offense. "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Lyon, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual. Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities. Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 271 inmates have died from COVID-19.[19] With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

### IV. A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Lyon.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The national attention of this case has been a deterrent for Mr. Lyon. Any time,

---

[19] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed December 8, 2021).

someone searches his name on social media, several articles on January 6th appear along with his photo and Thompson's trial.

The public has been protected while Mr. Lyon has been on pretrial release for the last 20 months. The public will be protected while Mr. Lyon is being supervised by the Probation Officer, which will further deter any criminal conduct. The Court may also impose additional conditions of probation in order to ensure the safety of the community.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions."). No incarceration is needed to deter criminal conduct in this case.

V. **The Pertinent Policy Statement Favors a Non-Custodial Sentence.**

Congress requires the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence **other than imprisonment in cases in which the defendant is a first offender**...." 28 U.S.C. § 994(j)(emphasis added).  Mr. Lyon has zero criminal history points.  See Final Presentence Report, ¶ 66.  In light of Mr. Lyon's status, a prison sentence would not be appropriate here.  The Sentencing Commission has noted that offenders who fall into Criminal History Category I are less likely to receive a straight prison sentence. [20]

VI. <u>**Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity**</u>

Sentencing Mr. Lyon to probation would not contribute to an unwarranted sentencing disparity.  Approximately 200 defendants have been sentenced in these cases.  More than 90% of the cases have been resolved as misdemeanor offenses. Of the misdemeanors cases, more than half have been sentenced to probation or home detention as a condition of probation.  January 6th defendants in other cases who pled to the *exact* same federal charge received probationary sentences.  *See United States v. Rachel Pert*, Crim. No. 21-cr-00139 (sentenced to 24 months' probation in a §1752(a)(1) case); *United States v. Jeffrey Witcher*, Crim. No. 21-cr-00235 (12

---

[20] *See* U.S. Sentencing Comm'n, *Recidivism and the "First Offender,"* (May 2004) p. 10, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (last accessed on April 29, 2021).

months' probation in a §1752(a)(1) case); *United States v. Nicholes Lentz*, Crim. No. 21-cr-00053 (1 month home detention and 36 months' probation in a §1752(a)(1) case).

There are several cases where defendants received sentences lower than 90 days for more egregious conduct than the conduct in this case. For example, in *United States v. Blake Reed*, 21-cr-204-BAH, the defendant discussed joining the Proud Boys. *Reed*, 21-cr-204-3, Gov't Sent. Memo, ECF No. 171, p.2. Mr. Lyon did not. Reed posted a video of the crowd marching toward the Capitol which included the threat "we are coming for you." *Id*. Reed brought and used protective gear to the Capitol. Mr. Lyon did not. Reed "took steps pre- and post-indictment to conceal electronic evidence on his phone." *Id*. at 3. Mr. Lyon did not. Reed took steps to conceal electronic evidence on his phone. Mr. Lyon did not and instead, allowed the authorities to search his phone. Reed appears to have mocked law enforcement after the execution of the search warrant. *Id*. at p. 25. Mr. Lyon did not. Reed was sentenced to 42 days' intermittent confinement, 3 months' home detention, and 36 months' probation, along with restitution and fines.

In *United States v. Schornak*, 21-cr-278-BAH, the government requested a 4-6 month sentence. the defendant pled to §1752(a)(1) and received a sentence of . In that case, Schornak "traveled to the Visitor's Center and stole an American flag." *Schornak*, 21-cr-278, Gov't Sent. Memo, ECF 62, p. 11. Schornak boasted about stealing the flag and causing tyranny inside the Capitol and he was "damn proud of it." Id. at 16. Mr. Lyon did not boast about any of his actions. Schornak received a

16

sentence of 28 days of intermittent confinement and 2 months of home detention, as a condition of probation, as well as restitution and fines.

Another case where an individual boasted and was proud of his conduct inside the Capitol is the case of Adam Johnson. *United States v. Adam Johnson*, 21-cr-648 (RBW). In that case, Johnson not only took Nancy Pelosi's lectern, he proudly displayed the lectern and posed for pictures with it. By contrast, Mr. Lyon did not take or post any photos was remorseful for his conduct the moment he went inside of the Capitol. Johnson was sentenced to 75 days of incarceration, supervised released, fines and restitution.

Similarly, in the case of *United States v. William Tryon*, 21-cr-420 (RBW), he "celebrated the riot by posing for a video" where he made comments about taking the country back. Id. at ECF No. 23 at 2, Gov't Sent. Memo. Tryon also tried to enter the Capitol but was met by officers. He was pepper-sprayed and hit by a baton and still entered the Capitol. The government argued, "Tryon is one of a much smaller group of rioters because he was expressly told by law enforcement officers that he could not enter the Capitol Building. He stood at the front of a mob that faced off with law enforcement officers at the entry to the Capitol." Id. at 12. Tryon was sentenced to 50 days incarceration, supervised released, fines and restitution.

In cases involving individuals sentenced under § 641, the defendant's conduct was worse than the conduct in the instant case. In *United States v. Robert Petrosh*, 21-cr-347 (TNM), the defendant stole two microphones from Speaker Pelosi's

lectern.  He also "celebrated as rioters broke through the police line inside the Crypt" and "told one of the vastly outnumbered officers in the Crypt, who was staring down an angry mob of rioters, to 'Give us Nancy.'"  Id. at ECF No. 40 at 2, Gov't Sent. Memo.  He also smoked a cigarette inside the Capitol.  By contrast, Mr. Lyon did not enter the building with the intent to steal.  He also did not celebrate his conduct.  Petrosh was sentenced to 10 days.

In *United States v. Jason Riddle*, 21-cr-304 (DLF), the defendant pled guilty under Sections 641 and 40 U.S.C. § 5104(e)(2)(G).  Riddle "stole a bottle of wine from that office, and drank the wine while watching the destruction of the office." Id. at ECF No. 31 at 2, Gov't Sent. Memo.  He also "stole the Parliamentarian's Senate Procedure book."  Id.  He also gave an interview to the local media where he described what his actions and he stated the he had no regrets."  Id.  By contrast, Mr. Lyon did none of these things.  Riddle was sentenced to 90 days for the theft offense and probation for the unlawful entry.

Of the nine factors that the government deems to be critical in these cases, most of them are mitigating factors in Mr. Lyon's case.  First, he did not want to enter the Capitol and only entered the building after being persuaded by Thompson. Second, Mr. Lyon did not encourage violence.  Third, he did not encourage property destruction.  Fourth, there is no evidence that he encouraged violence or destruction.  Fifth, during or after the riot, he did not destroy evidence.  Sixth, Mr. Lyon was inside the Capitol for 5 minutes.  While inside, he did not search for documents or destroy evidence.  Seventh, he did not boast about his conduct on

18

social media.  Eighth, he cooperated with law enforcement.  And ninth, he has demonstrated remorse.  As stated above, Mr. Lyon regrets going to the Capitol.

## Conclusion

Considering the § 3553(a) sentencing factors, a probationary sentence with a condition of home detention, and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

                        Respectfully submitted,

                        A.J. KRAMER
                        FEDERAL PUBLIC DEFENDER

                        _____/s/_____
                        Ubong E. Akpan
                        Assistant Federal Public Defender
                        625 Indiana Ave., N.W., Suite 550
                        Washington, D.C.  20004
                        (202) 208-7500